Welcome to the First Division of the First District Appellate Court of Illinois. We are here for oral argument in the case of Slyce, S-L-Y-C-E, Coal Fired Pizza Company v. Metropolitan Square Plaza, LLC. My name is Terry Levin and I'll be presiding today over the argument with my colleagues, Justice Aurelia Puccini and Justice Cynthia Cobbs. And we basically try to give each side 20 minutes, 15 to 20 minutes. The appellant should save about five minutes for rebuttal. And when you start your argument, we will do our best to find our internal mute button and give you five minutes or so without being interrupted, badgered, with some inquiries that we may or may not have. So with that, we will start by hearing from the appellant. Thank you, Your Honor. May it please the Court. My name is Jim Borsche. I represent the appellant, Slyce Coal Fired Pizza Company, in this case. The evidence at trial established that Slyce entered into a lease agreement with Metro to lease property to open a pizza restaurant but was not able to do so because Metro failed to meet its contractual obligations under the lease in numerous respects. The trial court's ruling on the party's cross claims for breach of the lease agreement was against the manifest way to the evidence. The evidence established that Metro breached the lease in multiple ways. The first issue I think you get into here is the decision to replace the floor. The parties don't agree on much, as you can probably see from the briefs, but the parties do agree the determining issue on liability is who is responsible to replace the floor at the premises. The trial court erroneously found that Slyce was responsible to replace the floor, but the evidence showed that Metro was responsible to replace the floor for many reasons. First, Metro, not Slyce, made the decision to replace the floor. It was Slyce's position the floor replacement was not necessary to move the ovens into place at the restaurant because the ovens would be just moved over the floor for a very short period of time. Slyce had a contractor come in and evaluate the situation and the contractor determined it was not necessary to replace the floor, but they were going to use steel planks to move the ovens to the resting place in the premises. The lease, which is Exhibit D of the lease, provides that the landlord at the landlord's expense shall perform all work other than the tenant's work set forth in section 2.7 of the lease to put the premises in condition to permit the tenant to commit its business therein. There's no dispute that there's nothing in the tenant's work that required the tenant to replace the floor. So, the other issue that comes up is that Metro took on the responsibility to replace the floor itself and under the law conduct can determine contractual obligations. And finally, the lease prohibited Slyce from deviating from the scope of work or making any structural changes in the premises. And here, the replacement of the floor was a structural change because not only was the floor replaced, but there were beams put in to support the floor. So, we believe the trial court erred in finding that Slyce was responsible to replace the floor. And that becomes important because the replacement of the floor really was the catechist for why this project got delayed. The requirement on the lease required Metro to perform its work timely. And Slyce advised Metro in 2018 that they needed to have the restaurant opened by no later than May of 2019. And their reasons for that were in the evidence. And that was, number one, Slyce was going to open up one open before the summer. The restaurant was going to have an outdoor patio. They'd already hired staff for the location. And Slyce was opening a different restaurant in the fall and they didn't want to open up two restaurants close together. Slyce, in terms of the lease itself, expected that Metro would finish its work and hand off the lease or the premises, finish its work by March of 2019, which would give Slyce enough time to do its finishing work to open the restaurant in the April-May time frame. To accommodate the opening and determine the actual reason why the timing was important, there were two lease provisions speaking to that. The lease didn't have a specific finishing date, but it did have, in section 2.7, it required Metro to use its best efforts to complete the landlord's work promptly. And in section 19.11, it said the time was of the essence of the lease for the performance of all obligations. The floor replacement was delayed by Metro. Metro did not advise Slyce that it tended to replace the floor until March of 2019, which is shortly before Metro, Slyce believed Metro was going to be handing off the property to have the restaurant open. And Metro stated at that point in time, what prompted that was Slyce was scheduling the ovens to be installed and the ovens were sort of a linchpin for the construction because the ovens had to be installed first and then the finishing work went around the ovens, the carpentry and everything else. These ovens were extremely big and heavy and were the key part of Slyce's business in terms of making the pizzas. Metro, when it heard about Slyce coming in to have the ovens put in place, stated hold off for a minute, we want to make sure that the weight of the floors can accommodate the ovens. Well, that really was an odd observation because Slyce had provided Metro the prior year, twice in May of 2018 and August of 18, the dimensions of these ovens. And it did that because it wanted to make sure that Metro was aware of what the size was so that Metro could fit the premises to accommodate the ovens. And in fact, in August of 18, Metro stated to Slyce, we, Metro, will calculate the load for the ovens and we'll add the steel to meet the oven requirements. That was in August of 2018. Now, we are now in March of 2019 when landlords should be done with their work and now we have a situation where Metro is saying these floors won't accommodate that oven, we have to now replace the floor, which was a stunning revelation to my client. And Metro tried to explain this with a red herring. Metro tried to suggest that the reason why they came up in March was because they learned for the first time that the ovens would be moved from the front of the restaurant and not from the back of the restaurant. But the evidence showed the ovens were always supposed to come in through the front. Metro, in fact, itself had the front glass window and brick wall removed to accommodate the ovens coming in from the front. And we, in the paragraph on page 20, we submit a photograph of the premises showing that that had been done. Metro's suggestion that the ovens could come in through the back, and that's what they expected, was wrong because given the dimensions of the oven, they couldn't come in the back. These ovens were over six feet tall, more than seven feet wide. The back had a standard door that would not accommodate the ovens. So, there was no way to get the oven through the back door, back of the rest of the premises, unless you knocked a wall down, which obviously was not feasible. Not only a wall, but also there is a cooler back there and electrical box that would also be removed. Also, in the back, the floor was ripped up by Metro doing their work that would not accommodate the ovens coming in through the back. None of the plans that were approved for the site that Metro submitted had any suggestion of any kind of wall being knocked down in the back. To accommodate ovens being moved in. And finally, the City of Des Plaines mandated the ovens come in through the front. There was an email put in evidence, February 25, 2019, where the City stated the ovens must come in through the front. So, this idea that Metro had that there was somehow their idea to come in through the back was not the evidence, not the facts. When Metro advised Slice, they had to replace the floor. That was in early March of 2019. Despite the fact they represented before that, the landlord works to be done by the middle of February. Now, from March 19, when Metro said they were going to replace the floor, the floor did not get replaced for months and months and months thereafter. In fact, in April 22, 2019, Metro told Slice, we're going to pour the concrete next week for the floor. That got delayed further and further. Slice later learned that Metro had not even supplied the permits for the floor until mid-May of 2019, which the City rejected in late May. Metro did not receive the permits for the floor until mid-June of 19, and the floor was not poured until June 22. So, this required, and after it was poured, it required a 30 to 60-day cure period before it could be done on the floor. Now we're talking about a restaurant that's supposed to be open by May, no later than May, which can't be open at the earliest now, if everything else gets done, until fall of that year, which obviously was not the party's expectations. Now, the delays by Metro went beyond the floor issue. Section 2.7 required Metro to do the property work within 30 days of approval of plans. The plans were approved in February. Property work was never finished, partly done but not finished. Metro was also issued a permit for the HVAC work in October of 2018, but as of June 19, that work had not been completed. So, Metro failed to complete the landlord's work under the lease. Let's get to a couple of questions, see if my colleagues have any questions here. Anything? Oh, you know what, I just have one. Mr. Borges, thank you so much. So, if in fact the ovens had come through the back, whose expense would that have been? Because the wall would have needed to have been knocked down. Well, that would have been Metro's expense because Metro would have been responsible for having that done. I mean, Metro was responsible to do the basically the build-out work. There's nothing in the lease that required my client to do structural changes to the building. Nothing at all? Nothing. That's all I have. Thank you, Judge. So, the issue of where the condition of the premises was when my client basically filed this lawsuit. Metro admits, and remember they were doing the work at this point in time, that even as when this lawsuit was filed in July of 19, they called the premises in a gutted condition and unleaseable. That's condition that they caused. They caused conditions, Metro, in the premises that really prevented my client from doing their work. Beyond the oven issue, the lease required Metro not to put the premises in a worse condition at the time the lease was executed in the late January of 2019. So, after January 2019, Metro created a large hole to accommodate the floor being replaced in the premises. And that's in the brief picture at page 19. This large hole prevented a lot of work from being done because you basically had a safety issue with the whole first floor being replaced. There were large amounts of construction debris Metro put in that was not there when the lease was signed. And doing work at that time with the hole in the floor, with the construction debris, would have been dangerous for my client to be able to perform any work, and it would also have been a violation of OSHA given the condition of the floor. There's also evidence that Metro failed to coordinate and communicate its work. And that's evidence in the emails back and forth. My client, again, was not advised that this floor was going to be replaced until mid-March of 2019, despite the fact that the workers would be done by that point in time. There was also issues on communications with the floor when they decided to replace it. We didn't hear about the permits being needed. We were told it's done soon, and yet it took months and months and months, more than three months after we were told to replace the floor before that was actually done. So Metro failed to deliver the premises to SLICE. Metro was always in control of the premises. They never handed off the premises to SLICE and never gave my client possession of the premises. And therefore, in terms of the liability issue, is, you know, my client was prevented from opening the restaurant. We told Metro we had to open the restaurant by May. Metro was still doing work on the restaurant up through June, and at that point in time, it was months before their work was going to be done, given the curing of the floor and other work that needed to be done. And my client put in evidence of what this cost them. They were suffering losses every month from the staff they had hired, from the promotions they had done. They were losing revenue per month, and the evidence is in May alone, they lost $300,000. In June, they lost $400,000 from the lack of Metro performing their work, which we believe constituted a material breach of the lease agreement. Now, there's also issues on damages. And we pointed out in the brief, the trial court awarded actual and liquidated damages. And the law says you can't get both. Actual damages were improper because of many reasons. The taxes that we were charged were not due under the lease until my client obtained a certificate of occupancy for the property, or 60 days after delivery of the premises. And that was never done here. Utilities were not ordered under the lease until Metro delivered possession of the premises, which never happened. The trial court also awarded construction expenses of over $100,000. Those were expenses for Metro's work, that my client should not have been charged for that because no circumstance is my client liable for Metro's work. The way the lease worked, each side was responsible for their own work on the property. So basically, to award rent damages and construction costs, it would be a windfall to Metro in this case. The trial court also awarded broker fees to Metro, despite the fact that broker fees were never paid. Metro included broker fees estimates of what they might have to pay in the future if they were able to lease the property out. But obviously, that was never done because in terms of the running of the break by Metro, they conceded. They still not rented out the property. Liquidated damages were also improper. Metro was awarded over $300,000 liquidated damages. Now, one of the problems is the lease provided liquidated damages were optional, and optional liquidated damages are not enforceable. The also problem with liquidated damages was you could not determine that the amount from the lease. Nowhere did the lease specify what it called as these fair and reasonable annual rental value of the premises, which would be an offset for the actual rent charges that was required to offset the amount of the or to calculate what the lease or the damages was. So the law says the contract has to specify and be able to calculate from the contract what the amount is. Here, that could not be done. In fact, in this case, Metro submitted three separate damage models to the court, the trial court, each with a different amount of liquidated damages. The other issue on the liquidated damages, it's a penalty. The way the lease was written, which is the determining factor for judging liquidated damages, Metro could obtain 10 years damages under the lease. And that's not reasonable. That's a penalty. And the Metro side of the case, actually, in their in their brief, the Hereford case where this court rejected a five-year period of liquidated damages. There's no evidence in this case that the party should have expected a time lease was entered into that Metro would not be able to release this property. And therefore, the penalty in this liquidated damages case functions as a penalty in that is not enforceable under the law. Finally, the final issue is the attorney's fees and costs was improper. And I will save some time for rebuttal. But basically, we outlined various amounts of issues with the attorney's fees that were awarded. My client was taxed with real estate attorney's fees, not beyond just the fees for this litigation. They also submitted the charge with real estate tax attorney's fees. We've outlined a number of problems with the fees and my client was not permitted to have an evidence in hearing, even though we had raised many fact issues with the attorney's fees request. And I'll save the time for rebuttal. Thank you, Your Honors. We'll hear from Mr. Graham. You're on mute. Check your buttons. You're on mute. Okay. Good afternoon, Your Honors. Daryl Graham on behalf of Metro in this matter. May it please the court. This appeal is an assault on the trial court's findings and conclusions. Indeed, there is not a finding or conclusion of law with which the appellants agree with. On liability, they have raised over 20 errors. On damages, they claim five errors and object to every element of damage and every model Metro supplied, even though in their post-trial submission, they admitted, quote, in the case of a breach, it is within the court's discretion to consider a fair and equitable amount of an award as it relates to compensation for rent, taxes, utilities, and construction costs. That can be found at C-947-48. On fees and costs, they object to every category of expense that we identified, and they object to 217 of 228 legal fee timesheet entries. Based on the breadth of the appellant's attack, one would think that the trial court had no idea what it was doing. In fact, the record demonstrates just the opposite. The trial court was both thorough and precise in arriving at its oral findings and conclusions and the ultimate judgment. Indeed, the trial court even considered and carefully analyzed defenses that the appellants did not plead, such as constructive eviction. You can see the trial court's analysis of that at SR-866. The reason for this disconnect between the appellant's characterization of an error-filled trial and the trial court record is that it's easy to claim error but impossible on this record to support the claim. And as we showed throughout our briefs, the errors that appellants identify are either unsupported or were never raised below and therefore waived or both. The burden, as Mr. Borsch has stated, the burden for appellants is very high. To succeed, appellants must show that the trial court's findings and conclusions were against the manifest weight of the evidence. In other words, they must show that the trial court's findings were unreasonable, that they were arbitrary, and that there was no evidence to support them. And the appellants have failed to do just that. Now, appellants would have this court believe that they did everything they were supposed to do and were ready, willing, and able to but for the delays Metro caused because of the need to replace the wooden floor with concrete. The trial court did not buy that, nor should you. Indeed, the trial court found, and I quote, end quote. That's at SR-863. Now, in preparing for this argument, I identified two important distortions of the facts that appellants have engaged in. They've raised so many others, and I'm going to try to go through those as well. I'm not sure I have the time, but I will. Okay, the first distortion is that they claim, Mr. Borsch claimed in his opening, that the appellants couldn't do any work until Metro completed its work. The lease provides at section 2.7, quote, each party hereto shall be completing landlord's work and tenant's work as the case may be at the premises simultaneously, end quote. That's Joint Exhibit 1 at C-1270. Appellants knew that they were to be doing work at the same time as Metro. It's right in the lease. Moreover, appellants were on site and working as the trial court found. They had their plumber putting in a grease trap, which was tenant's responsibility, not landlord's. It was tenant's responsibility. They had their architect, who was also our architect, they had their architect out there on a daily basis, going through the facility and drawing plans for their portion of the work, not for our portion of the work at that point, for their portion of the work. The lease in section 2.7 also provides, when you look through it, the lease provides that it sequences the work. It says within the first 30 days after permits are issued, landlord, that's Metro, has to complete the carpentry work. But it says quite clearly that our work, Metro's work, is not due to be completed until 10 days after Slice's work is to be completed. 10 days after Slice's work is to be completed. This idea that we had to do everything and then turn it over to them before they could start is simply not supported by the lease agreement or by the facts or by the testimony, for that matter. And the trial court saw that and concluded that, in fact, they could have been and were working out there at the site while we were working out there. And that 10-day requirement you're talking about is specifically from the lease agreement, right? It's from the lease agreement. It's, yes, it's Joint Exhibit 1, I think it's section 1270 and it's section 2.7. When I said section 1270, I mean record site 1270 and it's section 2.7 of the lease. Now, so that's one distortion. The second distortion is that they claim that they were ready, willing, and able at all times to move the project along. And this is perhaps the biggest distortion. From the start, they were the source of delay. The way this project worked is, first of all, the project got started really back in 2018. The parties met in the spring of 2018. They decided they would go forward with the project. In June of 2014, the architect began drawing plans for the project. It took the architect five months to complete the plans. Why did it take five months to complete the plans? Because, and these were only the landlord's plans. The architect also had to do plans for the tenant. He was working on those as well. The landlord's plans had to be started and completed before we could get permits to do the work on the project. It took five months to complete the plans because Slice, not Metro, Slice kept making changes to those plans. They made 12 changes. It required 12 changes before the plans were complete. Second, the contract, the lease agreement, Joint Exhibit 1 at 1306 Court Record Site, 1306 to 1307, has a couple of important points. One is that it again talks about sequencing. It says that Slice, not landlord, but Slice has to apply for its permits 60 days after execution of the lease. The lease was executed on 131 of 2019. Early April would be 60 days later. At that time, no permits had been applied for. The lease also provides, further down in that section, that same section, it further provides that tenants had to obtain permits within 90 days after execution. That would have been in early May. No permits were obtained by tenant to do tenants inside work. We had obtained all of our permits. They had obtained none of their permits. Indeed, in late June, at the time that they walked off this project, late June of 2019, they hadn't obtained any permits and were notified by the village that they still needed to obtain their permits. Now, there are other issues that are distortions that Mr. Borsha raised in his opening. First, he said that Metro made the decision to replace the floor. And that's just simply not true. And the record doesn't show that. The sequence of events was as follows. Out of those 12 plans, those 12 versions of plans that Metro, that Slice reviewed and kept changing, every drawing showed that the floor was wooden over the basement. So the way the building was laid out, it was divided into three parts. You had the front of the store was a slab on grade. So it was concrete on grade. There was no basement below it. The back of the store, the back of the restaurant was slab on grade. There was no, there was no basement below it. In the middle of the store, there was a basement. And over that basement was the wood. If the pizza ovens, which are each 6,500 pounds and have to be brought in on a forklift, if the pizza ovens were to come in through the back, then they were slab on grade. There was no need to replace the floor. The only reason there was a need to replace the floor was because the pizza ovens came through the front of the store. Whose decision was it to bring through the front of the store? It was Slice's decision. Slice's principal, Brittany Barth, testified that it was her responsibility to bring those ovens in. Slice's contractor, Mr. Altman, testified that it was their responsibility to get those ovens into the property. The decision, they determined how those ovens were going to be brought in. It wasn't, it was not Metro that decided that. It was Slice. Now, when did we know about this? We didn't know about this. We didn't know that the ovens were going to come in through the front of the building and had to traverse that wood floor until late March. This is after the, this is after we had actually done the demolition of the property. Not of the floor, but of the demolition of the rest of the property. This is after we had begun construction. This is after we had completed all the framing work. They made the decision to bring it in that direction, and that's what the court found. They could have brought it in through the back. Mr. Borsha says, no, can't bring it in through the back. Why can't you bring it in through the back? Because, oh my goodness, you'd have to break a hole in the door. You'd have to widen the door. Duggan, the architect, said that's commonly done in situations like this. It's often the case that you have to bring in large equipment. The parties had even talked about putting a hole in the roof to bring the ovens in. There were various ways to these ovens in. They made the decision to bring it through the front. Now, Mr. Borsha says another thing, which is simply not true, and I ask him to show it in the evidence. He says the city's determined that the ovens had to come in through the front. The city never determined that. There was no determination by the city that the ovens had to come in through the front. What he is referring to is a letter from the city which says that if you cross the walkway with the ovens, you need to lay down metal plates so that the pathway is not broken. That's not the same as saying that the city said, hey, you have to bring those ovens in through the front. Now, there's another thing that Mr. Borsha says, which I personally find troubling and frankly dangerous. He says we made the decision to replace the floor. It didn't need to be replaced because he had a contractor who said you don't need to replace that floor. Forget about it. We'll put plates over it. We'll drive 6,500-pound ovens over it. We'll put it on a forklift. That floral stand, that's a contractor. That's a truck driver who made that statement. That's not an engineer. Brittany Barth was involved in this decision. She met with Jim. She met with Dragon. This is what the testimony is, and this is what the evidence shows. They collectively decided that Dragon's engineer should do calculations to determine whether that floor would withstand that weight. His engineers did that and determined that it would not. It was at that point in late March, early April that it was determined that the floor had to be replaced. That wasn't our decision again. That was their decision. Now, there are several other points that Mr. Borsha raised, which are also distortions. He said toward the end, he said, you know, there were other breaches that we were engaged in. Another breach involved the fact that we had to complete the framing. I'm sorry, we had to complete the carpentry work, and none of the carpentry work was completed. That's simply not true. The evidence showed that the carpentry work that they were talking about in the lease was the framing, that the framing was done. He's going to come back, I'm betting, he'll come back in this argument and say, well, but the drywall wasn't up. The reason the drywall wasn't up, and we couldn't do the drywall, the reason the drywall wasn't up is because they had not finalized their plans on where electrical conduit would go, where ductwork would go. Both Brittany Barth and Lori Barth were asked during trial on the stand, could we have completed the drywall until you determine where the final ductwork would go, where the final exhaust vents would go, where the electrical would finally go? And they both admitted, no, they could not be. Mr. Altman admitted the same thing. So this idea that we didn't do anything, that we didn't comply with the contract is simply not true. Now, let me talk for a minute about breach of the lease, because Judge Cobbs asked the question, is there anything in the contract to suggest that it was Slice's responsibility, that the floor was Slice's responsibility? And the answer is, absolutely there was. And we raised it in closing arguments, we raised it during the trial, we raised it in closing arguments, we raised it in our post-trial briefs, we raised it in our appeal brief. They have never addressed these. So what is that? What is it I'm referring to? Well, what I'm referring to is, if you look at the lease, section 2.8 of the lease provides, and that's at C-1271, that landlord will not modify the building other than what he agreed to. And what it specifically states, and I'm quoting now, no agreement of landlord to alter, remodel, or decorate the building premises has been made by or on behalf of the landlord, except as stated in this lease, if at all, and tenant shall accept same in its as-is-where-is condition. We had no obligation to modify the building other than what was in the architectural plans, which they approved, which showed that there was a wood floor there. Not that there was a concrete floor, there was a wood floor. Let's go to section, let's go to Exhibit C to the same contract, and this is at C-1306. Exhibit C has to do specifically with tenant's work, okay? And I'm quoting now, it says, tenant at tenant's expense shall perform all work other than landlord's work set forth in section 2.7 of the lease to put the premises in condition to permit tenant to conduct the business therein, period, end quote. Well, to conduct the business, you have to get the ovens in. It's their decision on how to get the ovens in. They made the decision to come through the front. The building needed to be modified to accommodate that movement of the ovens across the wood floor. It's their responsibility under section, under this section, I'm sorry, it's their responsibility under Exhibit C of the lease to do that. It's not our responsibility. Now, Mr. Borsha says, well, wait a minute, you know, we, you know, we couldn't do anything to the building unless we had the approval of the landlord. Well, that's actually a silly argument. The reason it's silly is because once it was determined that the floor needed to be replaced, we all agreed that the floor needed to be replaced. It's not as if we somehow said, no, you can't replace the floor. In fact, we started on that project. Mr. Borsha blames, Mr. Borsha suggests that we somehow delayed that project, just the opposite. The evidence shows and the trial court found that we were the ones trying to move the replacement along and that they were not cooperating. They were non-responsive. This is what, what, what troubles me about both their position at trial and now is that they, they look at the record and they ignore it. The record is what it is. The lease says what it says, and they're trying to argue that none of this matters, that there's some other alternative lease out there. There isn't. Mr. Borsha boldly claims that these things don't exist when in fact they do exist. They're in the lease. Now. Why don't you move on to the damages issues? Yes, sir. Okay. There are a couple of points on damages. First of all, the main point that they're arguing about is liquidated damages and on liquidated damages, the issue, the cases that they cite and their construction of the language liquidated damages is misplaced. The cases they cite are ones where you can't recover both liquidated damages and compensatory damages where the liquidated damages are a substitute for compensatory damages. That makes complete sense. That would be double recovery. That would be a penalty. That's not the case here. Here, the contract in section 14.5, the contract in section 14.5 lays out three types of damages you can recover. None of them are redundant. None of them are double recovery. One type of damage is past rent, taxes, et cetera. That's one type of, so rent already due up to date that they have paid. That's one type of damage. Second type of damage is, it says that tenant can recover, I'm sorry, landlord can recover from tenant such expenses as landlord may incur in connection with the event of default, including all costs of preparing the premises for reletting, et cetera. And then it finally says, plus we can recover lump sum liquidated damages. What are the lump sum liquidated damages here? They are an estimate of our lost profits off of the lease going forward. It's not a lump sum. He talks about the case that says, well, you couldn't even recover it for five years, so why would we allow him to recover it for 10 years here? The five-year case was a total recovery of all lease costs. So they accelerated the lease for five years and gave the damages of that amount. In this case, what the court did is it took one of the formulas prescribed in the lease. And that formula was to look at the future rent for that 10-year period, discounted by 4%, offset it by alternative rent that one could expect another tenant to pay. And we had evidence of that in the trial court, at trial. And we showed because the building had been demolished, because of the situation that we were in, the rent that we could get prospectively was less than we could have gotten from Slice. The court then offset the future stream of rent from Slice, offset that against the future stream of prospective rent from another party. So what the court did is the court did exactly what any damage model would do in a breach contract case. It's the benefit of the bargain. And the benefit of the bargain was we were to have a 10-year lease at a price, and now we have to mitigate. We have to go out and find someone else. That's what the court did. So the idea that these liquidated damages are either double recovery or a penalty is just not true. In fact, there was a provision which the court rejected, the trial court rejected. There's a provision in the contract which allows us to accelerate the lease, the rent payments all the way through the 10 years, and we would get that bulk amount. That would have been a million dollars. The court rejected that. They said, we're not going to do that. What we're going to do is we're going to take the model also set out in the lease that offsets it, that gives a realistic value of damages. Now, if plaintiffs, if Slice says, you know, that's too speculative, then we're entitled, under the cases we cite in our brief, we're entitled to have, to retry this case on damages alone. If that's what Slice wants and that's what the court feels is fair, we're willing to do that. But we think that that's a waste of judicial resources as well as a waste of the party's resources. The other argument that they make is that you can't recover construction costs at the same time, excuse me, I'm getting dry mouth. You can't recover construction costs while recovering any other damages. As I quoted before, they said you could recover construction costs in their closing papers. In papers they submitted to the court, they told the court it was okay to award construction costs. They didn't challenge the construction costs until on appeal. That issue is waived. But even if it's not a waive, the reason we get construction costs is because we demolished the building. We took an operable building, which could have been a turnkey operation, would have had to be upgraded, but they were the ones that wanted a custom build-out. So that required us to demolish the entire interior of the building. That was our cost. We incurred that cost and we can't replace it. When the next party comes in, we have to do the same thing. We have to redemolish the building as it is now, and we have to build it out according to their specifications. That's the way these contracts work. That's what the evidence showed. In fact, Mr. Carcassise, the principal for Metro, testified that it is likely he will have to spend $300,000 repairing this build-out and doing a new build-out for the next tenant. All right, I'd ask you to wrap up your remarks. Thank you, Your Honor. I'll just say this in conclusion. This matter involves two rulings that have been separately appealed and consolidated. The first is for the damage award of $852,421.64 against Slice and the guarantors. We ask that that ruling, appeal number 1221279, be affirmed in its entirety to be collected with post-judgment interest so that Metro can begin to be made whole for the losses it has now been enduring for nearly six years. As to the appeal on attorney's fees, appeal number 1221868, we ask that the trial court's award of $187,413.75 be affirmed and the matter remanded for calculation of additional fees incurred in this appeal as provided by the party's lease, something the court recognized as proper in Wilmette Partners v. Hamill, a case which we cite. In the alternative, given that the trial judge in this matter has retired from the bench, this court may wish to consider directing Metro to submit its petition fees incurred in the appeal directly to the court if it so chooses. Thank you, Your Honors. I appreciate your time. Okay, some brief rebuttal. You're on mute, Mr. Borsche. Get your mute button there. Apologize, Judge, just to have it. Mr. Graham says this was a turnkey premises could have been turned over and operated as is. That's contrary to the evidence. His own client sent an email to my client when it was soliciting my client to come in saying, and this is at JX, record site C1471, that we need to extensively remodel the building because the previous owner neglected the space. So to suggest now this building was ready to be turned over and operated as a restaurant is absolutely false and contrary to the record. Mr. Graham asked me to point to in the record where the city of Des Plaines required the ovens to come in from the front. That's a document, a record site C980. The city manager stated the ovens need to enter through the front of the building. The whole issue of what he's trying to say, we didn't do our work. That ignores what they admitted. They admitted the key to the construction in this case was getting the ovens in first. Until the ovens were in, nothing else in substance could be done. And they were the ones, the evidence in the record is very clear, they are the ones who decided to replace the floor nine months after my client gave them the dimensions for these ovens and the weight of the ovens. And to suggest now that my clients made this decision is absolutely contrary to the record. The fact is my client had it set up. The contractor was going to move the ovens in with steel plates and Mr. Graham says they come in with forklifts. That's false. The forklifts lift the ovens off the truck onto the sidewalk. But the forklift doesn't go into the building. The building, they use equipment to build them in, not the forklift. And they were going to put steel plates down. And his client said, whoa, wait a minute. I need to make sure this is going to be okay, despite having the dimensions nine months earlier. At that point, he's the one who decided to replace the floor. How did we know that? What did he do? He did the work to replace the floor, months and months late. He never suggested, this is your responsibility, Slice, to replace this floor. He knew it was his responsibility because the lease provided that that was his responsibility if he decided to do that. My client couldn't stop that. But the fact is, until those ovens got put in place, which never happened, my client's finishing work was irrelevant. He also says he couldn't finish his carpentry work. And that's true. They did some carpentry, but they didn't finish. And the record shows their excuse for not finishing the carpentry work is because the ovens weren't in. So this whole idea, this whole suggestion now, that my client was responsible to replace the floor, or that somehow this was known to be convenient. By the way, Mr. Graham says they could come in through the back and just knock the door down. That's not true. If you look at the pictures, the area back in the back was cinderblock. You have to knock down a cinderblock wall. They never applied for a permit for that. It was never in the plans. They also knocked down electrical outlets. This was nowhere ever decided to be coming through the back. It was a figment of Metro's imagination, and it's a litigation excuse as to why they didn't forecast this earlier. And again, they were the ones who stopped my client's contractor from coming in and putting the ovens in. And they were the ones who took on the responsibility to replace the floor. And they didn't do it. They didn't do it for months and months and months later, which caused this whole project to be thrown out of whack and caused the whole project to fail. Mr. Graham never suggests when this work would have been done. They admit this work was done in a haphazard manner, even when we filed a lawsuit. It was a catastrophe. There was debris on the floor. They were the ones responsible. So we ask, Judge, you, your honors, reverse the trial court ruling. We get a new trial liability or liability in our favor. And you also reverse the awards on damages. Thank you. On behalf of my colleagues, I'd like to thank each of you for your professionalism, your brief writing, and the arguments made here today. We will take all of that into consideration in coming up with a disposition of the case in the next several weeks, shall we say. We are adjourned. Appreciate it. Thank you very much. Thank you.